**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| D.M., *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>WATCHUNG HILLS REGIONAL HIGH SCHOOL BOARD OF EDUCATION,<br><br>　　　　　　Defendant. | Civil Action No. 22-07500 (GC) (RLS)<br><br>**OPINION** |

**CASTNER, District Judge**

This matter comes before the Court upon competing motions for summary judgment filed by Defendant Watchung Hills Regional High School Board of Education (the "District") and Plaintiffs D.M. and H.M., individually and on behalf of D.G.M. (ECF Nos. 11, 13.) Both sides opposed, and only Plaintiffs replied. (ECF Nos. 19, 20, 21.) The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Plaintiffs' motion is **DENIED**, the District's motion is **GRANTED in part** and **DENIED in part**, and the matter is **REMANDED** to the Administrative Law Judge.

## I.    BACKGROUND

### A.    Individuals with Disabilities Education Act (IDEA)

Through the IDEA, the federal government provides funding to assist states with educating disabled children living within their borders. *See* 20 U.S.C. §§ 1400, *et seq.*; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014). To receive these funds, states must

adopt policies and procedures meant to ensure that all children with disabilities receive a free appropriate public education (FAPE).  20 U.S.C. §§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at 267-68.  In providing a FAPE, a state must provide an individualized education program (IEP) that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *J.M. v. Summit City Bd. of Educ.*, Civ. No. 19-00159, 2020 WL 6281719, at *1 (D.N.J. Oct. 27, 2020), *aff'd*, 39 F.4th 126 (3d Cir. 2022) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017)).  "If parents are dissatisfied with the district's determinations or IEP, they may bring a challenge in a state administrative process and then seek review in court."  *Id.*

### B.    Factual Background

This matter concerns the District's proposed IEP for D.G.M.'s placement for the 2021-2022 school year.  (R-7 (12th grade IEP).[1])

When Plaintiffs filed their administrative petition , D.G.M. was a student classified as eligible for special education and related services under the category "Mild Intellectual Disability," residing within the Watchung Hills Regional School District.[2]  (DSF & PRDSF ¶ 1; PSF & DRPSF ¶¶ 1-2; *see* R-1 ¶ 1 (due process hearing petition).[3])  Since his freshman year of high school in 2017, D.G.M. had an IEP placing him in "Special Classes"[4] for core academic subjects.  (DSF &

---

[1]    Exhibits beginning with "R" refer to exhibits presented by the District at the administrative hearing.  Exhibits beginning with "P" refer to exhibits presented by Plaintiffs at the hearing.

[2]    The District's Local Civil Rule 56.1 Statement of Facts (DSF) is at ECF No. 11-3; Plaintiffs' Response to the District's Statement of Facts (PRDSF) is at ECF No. 20-2; Plaintiffs' Local Civil Rule 56.1 Statement of Facts (PSF) is at ECF No. 13-3; and the District's Response to Plaintiffs' Statement of Facts (DRPSF) is at ECF No. 19-1.

[3]    *See* Def. Ex. B, ECF No. 11-6 at 13-21; ECF No. 14-3 at 5-13.

[4]    A "special class" serves "students who have similar intensive educational, behavioral, and other needs related to their disabilities in accordance with their IEPs."  N.J.A.C. 6A:14-4.7(a).

PRDSF ¶ 2; PSF & DRPSF ¶ 3; R-1 ¶ 1, 4.[5])  His Full Scale I.Q. Standard Score is 63, which places him at the first percentile level compared to his same-age peers.  (PSF & DRPSF ¶ 5; R-7 at 5.)  But, as his IEP notes, "[d]ue to variable performance across ability areas, it is difficult to describe [D.G.M.]'s overall intellectual functioning with a single score on the WAIS-IV as his verbal reasoning abilities are significantly more developed than his nonverbal reasoning abilities." (PSF & DRPSF ¶ 5; R-7 at 4.)  His Verbal Comprehension score was 74, which placed him at the fourth percentile level in terms of his verbal reasoning abilities.  (PSF & DRPSF ¶ 6; P-1 at 6, P0010 (5 Nov. 2019 CST psychological evaluation).)

In June 2020, D.G.M. completed his high school credit requirements, except for the "Statewide Assessment" requirement from which he was exempt, and graduated to the District's "Post Graduate" program.  (DSF & PRDSF ¶ 3; *see* R-1 ¶ 7; R-7 at 15.)

On December 8, 2020, when D.G.M. was a senior, the District convened an IEP team[6] meeting to (1) revise D.G.M.'s IEP for the duration of his senior year and (2) develop his IEP for his post-senior year, the 2021-2022 school year.  (PSF & DRPSF ¶ 42; 2Tr. 36:17-25;[7] R-7 at 1.)  At that meeting, the team discussed D.G.M.'s program for the following year, the 2021-2022 school year, which would follow his senior year of high school.  (PSF & DRPSF ¶ 43.)  That was not the first time that they had discussed D.G.M.'s "transition program," which they had begun discussing since at least eleventh grade, or when D.G.M. began attending his own IEP team meetings with Linda Zawisha, D.G.M.'s case manager.  (PSF & DRPSF ¶ 44.)

---

[5]  (*See, e.g.*, P-5 (9th grade IEP); R-7 (12th grade IEP).)

[6]  The *IEP team* includes "the parents of a child with a disability."  20 U.S.C. § 1414(d)(1)(B)(i).  D.G.M.'s parents attended the meeting.  (PSF & DRPSF ¶ 42.)

[7]  The Office of Administrative Law held a two-day hearing on May 23, 2022 ("1Tr.") and May 25, 2022 ("2Tr.").

After that meeting, the District prepared an IEP describing D.G.M.'s placement for the rest of the 2020-2021 school year and the start of the 2021-2022 school year. (PSF & DRPSF ¶ 60; R-7.) The proposed IEP would maintain D.G.M.'s IEP without change for the rest of the 2020-2021 school year. (PSF & DRPSF ¶ 61; R-7; P-7 (10 Dec. 2019 IEP).) For his post-senior year, i.e., the 2021-2022 school year beginning in September 2021, the District proposed placing D.G.M. in its "Post Graduate" program, which consisted of the Career Academics class and Structured Learning Experience (SLE). (PSF & DRPSF ¶ 62.) The Career Academics class would meet three periods per every four-day cycle, and the SLE would meet 12 periods per every four-day cycle. (PSF & DRPSF ¶ 64.) The proposed IEP included essentially the same goals as those in the prior year's IEP, and it added no different goals for the Career Academics class or SLE. (PSF & DRPSF ¶ 63; *compare* P-7 at 9-10, *with* R-7 at 9-10.)

On December 14, 2020, shortly after the IEP team meeting, D.G.M. applied to The College of New Jersey's Career and Community Studies (CCS) program. (PSF & DRPSF ¶ 66; P-14 (CCS application).) On March 16, 2021, D.G.M. was accepted into the program. (PSF & DRPSF ¶ 68; P-18 (CCS acceptance); P-22 (17 Mar. 2021 email).)

By letter dated March 18, 2021, Plaintiffs advised the District that D.G.M. had applied to and was accepted into TCNJ's CCS program and asked the District to place him in that program for the 2021-2022 school year or otherwise pay for his tuition and related costs. (PSF & DRPSF ¶¶ 69-70; DSF & PRDSF ¶ 4; P-23 (18 Mar. 2021 letter); *see* ECF No. 1 ¶¶ 34-37.) Plaintiffs warned that if the District refused, they would place him there privately and seek reimbursement of his tuition and related costs from the District. (PSF & DRPSF ¶ 71; DSF & PRDSF ¶ 4.)

On March 31, 2021, the District responded that its proposed IEP program for D.G.M. was appropriate. (PSF & DRPSF ¶ 72; P-24 (31 Mar. 2021 letter); ECF No. 1 ¶ 38.)

### C.    Administrative Process

On September 29, 2021, Plaintiffs filed a due process petition contending that the District failed to offer D.G.M. an appropriate IEP and therefore violated D.G.M.'s right to a FAPE guaranteed under the IDEA, Section 504 of the Rehabilitation Act of 1973, and unspecified New Jersey special education laws.  (DSF & PRDSF ¶ 7; PSF & DRPSF ¶ 87; R-1.)  In their petition, Plaintiffs sought the following relief:

- a declaration that . . . the District has violated D.G.M.'s right to a FAPE, which he is guaranteed under the IDEA, the ADA, Section 504 and New Jersey's special education laws, and that TCNJ's CCS program offers him a FAPE;

- an order directing the District to reimburse Petitioners for the costs of D.G.M.'s unilateral placement until the time of a final decision in this matter;

- an order directing the District to place D.G.M. at TCNJ's CCS program pursuant to an IEP;

- attorney's fees and costs; and

- such other relief as is just and appropriate.

[(DSF & PRDSF ¶ 8.)]

The ALJ held a two-day hearing on Plaintiffs' petition.  (DSF & PRDSF ¶ 9.[8])

The ALJ ruled in the District's favor after hearing testimony from four witnesses.  The ALJ summarized and credited the witnesses' testimony as follows.[9]

### 1.    Linda Zawisha, LDC, Testimony

Linda Zawisha, a learning disabilities teacher consultant (LDTC or LDC), testified for the District as an expert witness in special education and special education programming.  (ECF No.

---

[8]    The May 23, 2022 Transcript ("1Tr.") is at Defense Exhibit D, ECF No. 11-6 at 41-169; the May 25, 2022 Transcript ("2Tr.") is Defense Exhibit E, ECF No. 11-6 at 170-334.

[9]    In this section, the Court recites testimony as the Administrative Law Judge presented it in his decision, with minor alterations for clarity.

11-6 at 22-40, ALJ Op. 2.)  Zawisha, who was D.G.M.'s case manager since he started high school in Watchung, authored the proposed IEP.  She described D.G.M. as a "friendly, warm student" and an "all around very nice young man."  She testified that D.G.M. has a mild intellectual disability, which means approximately two standard deviations from the mean on standardized tests.  (ALJ Op. 2-3.)  He lacks the ability to comprehend critical thinking information in reading comprehension or language.  (ALJ Op. 3.)  He had several electives and was integrated in general education , "so according to the IEP the teachers taught to goals and objectives in the IEP."  (ALJ Op. 3.)  The ALJ noted that as here, the LDC typically relies on the evaluations from all members of the IEP team to meet the goals and objectives of the students' structured learning experience.  (ALJ Op. 3.)

The District's SLE includes real-world experiences in working businesses.  As noted in the December 2020 IEP, D.G.M. told Zawisha that he had already applied for the CCS program at TCNJ.  (ALJ Op. 3 (citing R-7).)  The plan was for the District to prepare him to participate in that program, but D.G.M.'s parents wrote the school, advising that he was being unilaterally placed at TCNJ.  (ALJ Op. 3 (citing R-9).)  The ALJ found that the IEP shows content-related services and an extended school year for continuity of education; there is no gap in his education.  The ALJ determined "[t]his is critical for a student like [D.G.M.] with his standardized testing scores."  (ALJ Op. 3.)

The parents retained Jeanne Tighe, a speech-language pathologist, to observe the Career Academics class.  Based on her observations, Tighe generated a report opining that there was no FAPE; however, the ALJ noted, "this is not true because there were no 'parallels' in the evaluation."  (ALJ Op. 3.)  The ALJ also noted that Tighe did not observe a class with D.G.M. or his related peers in it.  She simply examined a class whose students were not at D.G.M.'s level and

did not receive the same programming as D.G.M.  "It is essentially like comparing apples to oranges," according to the ALJ.  (ALJ Op. 3.)

According to the ALJ, D.G.M. was progressing gradually and incrementally.  The progress was reported accurately and represented his achievements.  (ALJ Op. (citing R-12).)[10]  Even small progress represents achievement.  The ALJ noted, "The IEP in this case was appropriate because it would allow him to be in a field of his choosing and have a job coupled with positive reinforcement through achievement." (ALJ Op. 7.)  The Career Academics class was being offered three to four days a week for 56 minutes each.  (ALJ Op. 3 (citing "R-7 bottom of pg. 12").)  Social Skills Group, Speech-Language Therapy, and an extended school year were also continued.  (ALJ Op. 3.)

On cross-examination, Zawisha admitted that the IEP does not describe the Career Academics class or SLE.  "In fact, there is no description of much of the programming because you simply cannot include all of the information and explanation in the IEP.  Here, the career academics class is clearly offered as programming."  (ALJ Op. 4 (citing R-7 at 12).)  It would address transitional skills into the work world.  Career Academics followed the goals of D.G.M.'s IEP.  The ALJ noted, "The parents would certainly be able to get an explanation of the goals of programming from any of the staff members."  (ALJ Op. 4.)  It was offered because D.G.M. expressed a desire to attend a four-year college, and no staff member would hold him back.  He always expressed an interest in sports, and no one would discourage a student from any positive pursuit.  "Employment goals evolve and change," but there always is a continued discussion with staff members.  (ALJ Op. 4.)  All the services provided would allow him to bridge the gap to adult

---

[10]    For the May 2021 reporting period, D.G.M.'s progress report notes his progress as "PG," or progressing gradually, "which means he might not make that goal by the end of the year."  (1Tr. 45:3-10 (Zawisha); R-12 at 4.)

goals.  Transition services are offered to him to meet his goals.  When questioned by the ALJ, Zawisha agreed that "you can't push a student and allow him to fail."[11]  "We had extensive community services and had services to support its curriculum."  (ALJ Op. 4 (citation omitted in original).)

### 2.    Dr. Patrick O'Halloran Testimony

Dr. Patrick O'Halloran testified for the District as an expert witness in child psychology and special education.  He testified that he never evaluated D.G.M., though he did meet him and found him to be appropriate for programming that would confer upon him an educational benefit, most specifically the SLE career academics programming.  (ALJ Op. 4.)

The SLE program at Watchung Hills is described as an in- and out-of-school program.  The SLE program is a series of programming that begins by exploring employment opportunities and building skills that facilitate positive work experience.  (ALJ Op. 4.)  It begins by teaching resume preparation, network building, addressing issues with agencies to help, dressing for interviews, the interview process, and different types of jobs.  Watchung Hills partners with four local business establishments, including the Warren Township hardware store, Walgreens, Shop Rite, and the Warren Township library.  After completing the classroom portion, students participate in real-world work experience at the four local businesses.  The ALJ noted, "The school does take the students' input on where they would like to be placed . . . , where they are more adept and skilled, but each student participates in the four work experiences throughout the year."  (ALJ Op. 4-5.)

Dr. O'Halloran criticized Tighe's opinion that D.G.M. had higher functioning learning and skills whereas the SLE program was lower functioning and significantly mismatched with

---

[11]      Though the ALJ noted, "You have to encourage 'honest discussion' and set out 'realistic goals' as well as the steps to get there," those quotes do not appear in the transcript.  (ALJ Op. 4.) The Court construes these notes as the ALJ's interpretations and summaries of the testimony.

D.G.M.'s abilities.  According to the ALJ, Dr. O'Halloran testified, to the contrary, that the class is tailored to the students' needs.  "It is not a one-size-fits-all"; "[i]t's differentiated for each student." (ALJ Op. 5.)  And contrary to Tighe, "yes, there are textbooks." (ALJ Op. 5 (citation omitted in original).)

On cross-examination, "Dr. O'Halloran testified that he did not know what D.G.M.'s goals were and did not know specifically other than what is in the IEP." (ALJ Op. 5.)  He was critical when confronted with the question that D.G.M. would be communicating with his peers in high school when he is 20 years old.  Dr. O'Halloran acknowledged that D.M.G. would be communicating with ninth through twelfth graders.  However, he agreed that many ninth graders have a maturity level that is far greater than many 20-year-olds.  He also testified that although standardized testing scores are not the be-all end-all in evaluations, D.G.M.'s testing scores were at the one percentile, "which provides ample proof that the programming []offered by Watchung Hills addresses his academic and social challenges and clearly provides FAPE." (ALJ Op. 5 (citing R-7 at 4-5).)

### 3.   H.M. Testimony

H.M., D.G.M.'s mother, testified for Plaintiffs.  She described D.G.M. as very personable and determined.  He wanted to be in college and would many times comment "mommy thank you for sending me to a good college." (ALJ Op. 5.)  He always had dreams of a bachelor's degree. (ALJ Op. 5.)

His high school transcript showed that he did well and had a well-rounded curriculum. (ALJ Op. 5 (citing P-13).)  He had activities of daily living (ADL) classes that allowed him to interact with kids, and he enjoyed it.  He aspired to couple his love for sports with education either as a gym teacher or in some type of sports management.  D.G.M. tried out for the basketball team

but did not make the team; however, he was so involved that he became the team manager.  He also played on the football team all four years of high school.  During his high school career, he also had jobs at Burger King and Stop & Shop.  He was also a member of the youth ministry at church.  (ALJ Op. 5-6.)

Regarding the December 8, 2020, IEP (P-4; R-7), H.M. spoke with members of the school about programs for D.G.M. when he was in tenth or eleventh grade regarding his twelfth-grade year and beyond.  She indicated that the academic component seemed to reduce over the years and more of the focus was on-the-job training in the SLE program.  H.M. did not believe that Zawisha was focusing on academics enough.  At that point, she saw the CCS program at TCNJ, and it was recommended by Joseph Toye, a teacher at Watchung Hills.  After the family looked into the CCS program, they liked its focus on writing as opposed to going out into the community and interacting in the job market.  This was simply because D.G.M. already participated in those activities and already possessed those skills.  H.M. told Zawisha about the CCS program and there appeared to be no adjustment in D.G.M.'s curriculum.  There was no adjustment made to any academic portion.  In fact, Zawisha only told H.M. to "give it time and see what happens with the program, there are different things they can modify as they go along" for D.G.M., but that didn't "make sense."  (ALJ Op. 6.)

The parents wanted D.G.M. to develop and continue growing.  H.M. was quite clear that she "did not care if it came from TCNJ or Watchung Hills."  (ALJ Op. 6.)  The deadline to apply was approaching, and since talking about it she "felt like nothing was going to change," they proceeded with the application to the CCS program at TCNJ.  (ALJ Op. 6.)

The application process went well and D.G.M. was accepted.  "Zawisha even wrote him a letter of recommendation."  (ALJ Op. 6.)  But when Plaintiffs asked the District to contribute toward the tuition, the District refused.  (ALJ Op. 6.)

On cross-examination, H.M. testified that the goals and objectives in the IEP were sufficient but D.G.M. needed more.  "Individual goals were adequate"; the problem was the program's format.  (ALJ Op. 6.)  The SLE program had a big bulk of hands-on experience, but the academic portion was limited.  H.M. also testified that there was no option to modify the SLE program; however, the ALJ noted, this was contrary to her testimony on direct examination when she testified that Ms. Zawisha told H.M. to "give it time and it could be modified for [D.G.M.]" (ALJ Op. 6-7.)

4.   <u>Jeanne Tighe, M.A., Testimony</u>

Jeanne Tighe, M.A., testified for Plaintiffs as an expert in speech language pathology.  Dr. Tighe authored an evaluation report of D.G.M. after viewing him in his program.[12]  (P-27.)  She explained her process that began with reviewing D.G.M.'s history with the parents and records as well as an office visit and testing.  In the comprehension section, she noted that D.G.M. does not process spoken language as quickly as others but had average scores.  He was certainly below average for 18-year-olds in the areas of expression.  (ALJ Op. 7.)

She had the opportunity to observe the SLE class.  She understood that the SLE program at Watchung Hills entailed mostly work experience and limited academic components.  The school confirmed her understanding.  During her observation of the class, which was approximately 56 minutes, "all the students had very low expressive language skills" much lower than D.G.M.  The

---

[12]     Plaintiffs submit that "[s]hortly after the conclusion of the hearing, Dr. Tighe received her Speech Language Pathology Doctorate degree."  (PSF ¶ 7 n.2.)

teacher did very well in commanding the class, which was involved in finding the prices on items. The class was comprised of two adults and five students.  She does not believe that the class would meet D.G.M.'s needs, because he had needs above the level of that particular class.  If a teacher could differentiate in class, it still "wouldn't be able to meet [D.G.M.]'s needs" because it worked as a group, and he was well above the level of that particular group.  (ALJ Op. 7.)  "The class wasn't calibrated to him"; however, the ALJ noted, "the CCS program at TCNJ was specifically calibrated to the individual student and the program could meet his needs."  (P-28 (Tighe April 2022 observation report); ALJ Op. 7.)

5.   Amy Schuler Testimony

Amy Schuler, the Assistant Director of TCNJ's CCS program, testified for Plaintiffs.  The program is 16 years old and the "first of its kind in the country."  The program has several components, including academics, student life, and real-world applications.  Approximately 10 to 12 students are selected for the program per year.  After graduation, students obtain a certificate of career studies.  The program entails taking 45 classes[13] both in the CCS program and general education at TCNJ.  The program is based on a peer mentorship foundation model.  In other words, other TCNJ students mentor program students.  (ALJ Op. 7.)

During their senior year, students are set up in internships all over the area.  Current examples of internships include at Johnson & Johnson, Bristol-Myers Squibb, a local daycare facility, Mercer County Superior Court, and McCarter Theatre group.  She is very familiar with D.G.M. and says he is doing "terrific," in class as an "A student," and socially he is a well-liked young man.  (ALJ Op. 8.)

---

[13]    The ALJ's opinion states "forty-five classes," though according to the transcript Schuler testified that "students take between four and five classes a semester."  (2Tr. 145:21-22.)

### 6.    ALJ's Credibility Determinations

The ALJ did not believe that the District employees, from their testimony, would want to deprive D.G.M. of any programing to augment his educational opportunities.  But, the ALJ continued, they must also work within the parameters of the law, regulations, and facts as presented — not merely thoughts or desires that are unsupported in fact.  The ALJ also recognized that the parents want the best educational opportunity for D.G.M., and they are providing it for him at TCNJ's CCS program.  The ALJ ruled, however, that the District is not responsible to fund it.  The ALJ concluded, "I do not find that there is an issue of credibility as much as an issue of experience and knowledge."  (ALJ Op. 9.)

### 7.    ALJ's Findings of Fact

The ALJ accepted "the information set out by the District as **FACT**," making the following specific findings:

- [T]he testimony of the District's witnesses [was] credible to the extent of implementing the proposed IEP and programming with the SLE.

- [T]he services provided by Watchung Hills clearly provide more than a "trivial" or "de minimis" educational benefit and [D.G.M.]'s education plan provides for "significant learning" and confers "meaningful benefit" to him.

- [T]he IEP provided by the District contained specific statements of the student's current performance levels, the student's short-term and long-term goals, the proposed educational services, and criteria for evaluating the student's progress.

- [T]he IEP contained both academic and functional goals related to the Core Curriculum Content Standards of the general education curriculum and "be measurable" so both parents and educational personnel were apprised of "the expected level of achievement attendant to each goal."

- [T]he District provided "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" and provided FAPE.

- [T]he District could modify the program to accommodate the needs and desires of [D.G.M.]

[(ALJ Op. 9-10.)]

       8.     <u>ALJ's Conclusions of Law</u>

The ALJ concluded that the District proved that it "offered FAPE in the proposed IEP and programming," as "[t]he competent, credible, and relevant evidence . . . abundantly demonstrates that the proposed IEP and programming including the SLE addresses the many complexes of [D.G.M.]" (ALJ Op. 12-13.) The ALJ further concluded as follows:

> The IEP offered by the District here addressed [D.G.M.]'s individualized needs and created an appropriate system of goals and objectives to measure his progress in both short- and long-term goals. The IEP included specific, measurable goals pertaining to specific skills and reading and language programming. The inclusion of generalized instructional techniques—such as added time as needed, eliminate visual distractors, and general in-class support—is alone not enough to carry the District's burden of proof that FAPE was offered. *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 567 (3d Cir. 2010). However, this is not a generic IEP and is specifically designed to meet [D.G.M.]'s individualized needs and confer upon him a meaningful educational benefit in the least restrictive environment. This coupled with the fact that the SLE program could be specifically modified and differentiated for [D.G.M.] further supports my conclusion. Although the SLE program at Watchung Hills may not be to the level or have the resources available as the CCS program at TCNJ, as admitted by H.M. during her testimony, the SLE program could have been modified to suit the needs of [D.G.M.] Unfortunately, that's not acceptable by the petitioners. Also, unfortunate is the fact that the District is not responsible to fund the unilateral placement. **I CONCLUDE** that contrary to the petitioners, the District through its IEP and extensive programming provided FAPE to [D.G.M.]

[(ALJ Op. 13.)]

The ALJ also denied Plaintiffs compensatory education relief, though Plaintiffs say they never sought that relief. (ALJ Op. 13-14; *see* ECF No. 13-2 at 37-38.)

The ALJ ultimately denied and dismissed Plaintiffs' due process petition. (ALJ Op. 14.)

D.     **District Court Proceedings**

Following the ALJ's decision, Plaintiffs filed suit in this Court.[14]  (ECF No. 1.)  Plaintiffs assert violations of (1) IDEA, 20 U.S.C. §§ 1400, *et seq.*; (2) Title II of the ADA, 42 U.S.C. § 12132; and (3) Section 504, 29 U.S.C. § 794.  The District answered.  (ECF No. 3.)  Because the parties did not intend to bring new evidence before the Court, the parties moved for summary judgment.  (ECF Nos. 11, 13.)

II.    <u>**LEGAL STANDARDS**</u>

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record."  *K.H. ex rel. B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, Civ. No. 05-4925, 2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006) (citing *G.A. ex rel. M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003)).  "The standard of review under which this Court considers an appeal of a state administrative decision under the IDEA differs from that governing the typical review of summary judgment."  *M.A.*, 202 F. Supp. 2d at 359 (citation and internal quotation marks omitted).  The parties' motions, though framed as ones for summary judgment, are truly appeals of the ALJ's ruling.  *G.S. v. Cranbury Twp. Bd. of Educ.*, Civ. No. 10-774, 2011 WL 1584321, at *8 (D.N.J. Apr. 26, 2011), *aff'd*, 450 F. App'x 197 (3d Cir. 2011); *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007), *aff'd*, 263 F. App'x 264 (3d Cir. 2008).

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ."  *L.E. v. Ramsey Bd.*

---

[14]     This Court has subject-matter jurisdiction under 20 U.S.C. § 1415(i)(3)(A) and 28 U.S.C. §§ 1331 and 1343.  *See K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 253 (3d Cir. 2018); *E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68, 71 (3d Cir. 2018).

*of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).  "Factual findings from the administrative proceedings are to be considered prima facie correct,' and if the reviewing court does not adhere to those findings, it is obliged to explain why."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citation and internal quotation marks omitted).  "Moreover, the reviewing court must accept the ALJ's credibility determinations and 'may disturb them only upon a finding that non–testimonial extrinsic evidence justifies a contrary conclusion.'"  *E.P. v. N. Arlington Bd. of Educ.*, Civ. No. 17-08195, 2019 WL 1495692, at *4 (D.N.J. Apr. 1, 2019) (quoting *C.S. v. Montclair Bd. of Educ.*, Civ. No. 16-3294, 2017 WL 4122433, at *4 (D.N.J. Sept. 18, 2017)).  An ALJ's legal determinations, on the other hand, are reviewed de novo.  *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011).  "Applying these standards, the district court may make findings "based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education."  *Id.* (quoting *Bayonne*, 602 F.3d at 564).

Relevant here, district courts cannot "substitute their own notions of sound educational policy for those of the school authorities."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982).  Indeed, "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'"  *Id.* at 207-08 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)).  So when the administrative body does not adequately explain its findings, the district court may remand the matter for further development.  *See, e.g.*, *Upper Freehold Reg'l Bd. of Educ. v. T.W.*, 496 F. App'x 238, 244-45 (3d Cir. 2012); *Livingston Bd. of Educ. v. D.A. on behalf of D.A.*, Civ. No. 17-8802, 2021 WL 3706723, at *5 (D.N.J. Aug. 20, 2021).

III.     **DISCUSSION**

Plaintiffs make various objections to the ALJ's final decision.  For several objections, the final decision as written is consistent with the record evidence, making it clear that on those issues, the ALJ's findings were correct.  As to other objections, however, the ALJ's final decision is less developed, such that the Court cannot assess whether the ALJ correctly concluded that the District's proposed IEP and placement for the 2021-2022 school year was appropriate for D.G.M.  And so, as discussed below, the District's motion is granted in part and denied in part without prejudice, Plaintiffs' motion is denied without prejudice, and the matter is remanded to the ALJ to supplement the final decision.[15]

A.     **Count I: IDEA Violation**

"[T]he Supreme Court has directed that a school district's liability for violations of the IDEA is a two-fold inquiry: (1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?"  *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) (citing *Rowley*, 458 U.S. at 206-07).

Here, Plaintiffs assert that the District violated its substantive obligations under the IDEA.  (ECF No. 1 ¶¶ 41-48; *see generally* ECF No. 13-2.)

Under the IDEA, school districts must work with parents to design an IEP.  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)).  An "IEP must include an assessment of the child's current educational performance, must articulate

---

[15]     The District's motion is granted in part only in that the Court rejects several of Plaintiffs' objections, under Federal Rule of Civil Procedure 56(g): "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case."

measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)).  "Although the IEP must provide the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010)).  Rather, an IEP must, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Ridley*, 680 F.3d at 269 (internal citations and quotation marks omitted); *see K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (noting the "longstanding formulation" described in *Ridley*); *see also E.P. v. N. Arlington Bd. of Educ.*, Civ. No. 17-08195, 2019 WL 1495692, at *4 (D.N.J. Apr. 1, 2019) ("[T]he IDEA 'requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017))).

Plaintiffs argue that the proposed IEP failed to offer D.G.M. a FAPE for the 2021-2022 school year, because the proposed Post Graduate program was not reasonably calculated to enable him to make progress appropriate given his unique needs.  (ECF No. 13-3 at 5, 12, 15, 18.) Plaintiffs contend that the IEP needed to enable D.G.M. to continue making progress toward his postsecondary goals of attending college away from home and gaining employment in sports management, physical education, and athletic coaching or training.  (ECF No. 13-3 at 18-19.) Plaintiffs assert three main reasons why the ALJ erred in finding that the proposed IEP met that mandate.  The Court will address each reason in return.

1. <u>Proposed IEP's Content</u>

Plaintiffs first assert that the IEP lacked necessary information about D.G.M.'s goals and the proposed program.

First, Plaintiffs say the goals in the proposed IEP are nearly identical to those in the past IEP even though D.G.M.'s program would change substantially.  (ECF No. 13-2 at 20-21; P-7 at 9-10.)  Instead of a full day of traditional academic classes, the proposed Post Graduate program consisted of only two classes — the Career Academics class and SLE — that would meet less often and for less time and focus on pre-employment and functional life skills and community-based learning experiences.  (*Compare* P-7 at 1-2, ECF No. 14-5 at 6-7, *with* R-7 at 1-2, ECF No. 14-3 at 86.)  Despite this change, the ALJ found that "the IEP contained both academic and functional goals related to the Core Curriculum Content Standards of the general education curriculum and 'be measurable' so both parents and educational personnel were apprised of 'the expected level of achievement attendant to each goal.'"  (ALJ Op. 10.)

Plaintiffs' position — in essence, that common sense must dictate that a substantial program change warrants revising the student's goals — is a mere disagreement with the ALJ's decision, not a legal basis for reversing it.  Even if the Court agreed with Plaintiffs, the Court cannot "substitute [its] own notions of sound educational policy for those of the school authorities."  *Rowley*, 458 U.S. at 206.

And still, "the mere fact that a student's IEP goals are continued does not necessarily mean that the similar IEPs were not reasonably calculated to confer educational benefit."  *James D. v. Bd. of Educ. of Aptakisic-Tripp Cmty. Consol. Sch. Dist. No. 102*, 642 F. Supp. 2d 804, 827 (N.D. Ill. 2009) (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995)); *c.f. Damarcus S. v. D.C.*, 190 F. Supp. 3d 35, 53 n.7 (D.D.C. 2016) (admonishing that a "wholesale, cut-and-paste

repetition is symptomatic of a larger, more concerning failure by the District to adapt its approach in the face of [the plaintiff's] continued frustration and lack of progress").

Plaintiffs do not submit that D.G.M.'s goals remained "in the face of . . . continued frustration and lack of progress." *Damarcus S.*, 190 F. Supp. 3d at 53 n.7. Indeed, the record demonstrates that D.G.M. had progressed well. For example, in their March 18, 2021 letter to the District, Plaintiffs noted that the school had "served [D.G.M.] well until now." (R-9.) For another, D.G.M.'s progress reports show that D.G.M. made progress on most of his academic goals with a full load of academic classes. (R-11 (March 2021 progress report); *see also* 2Tr. 14:14-16:10 (H.M.) (testifying that "D.G.M. has done really well" in the high school).)

And by his mother's testimony, D.G.M. still could benefit from the continued goals. When asked about the appropriateness of the proposed IEP goals, D.G.M.'s mother testified that for "the reading section," she "didn't think that [the goal] was not something that . . . could be a goal that D.G.M. would work on." For "the writing section," which D.G.M.'s mother described as D.G.M.'s strength, the goal was "probably something [D.G.M.] would need to work on." (2Tr. 38:24-25, 72:25-73:13, 78:11; R-7 at 9-10.) As to the math section, D.G.M.'s mother testified that "the individual goals as they're written . . . in some ways could be adequate," but that "the way the program was set up and . . . laid out" made it unlikely that D.G.M. would meet these goals. (2Tr. 74:1-6.)

Therefore, the fact that the program would change substantially does not alone justify reversing the ALJ's finding that the proposed IEP was appropriate.

Second, Plaintiffs contend that in the IEP, the "Postsecondary Education," "Employment/Career," and "Independent Living Skills" notes "remained unchanged, vague and even inaccurate." (ECF No. 13-2 at 21 (citing R-7 at 7).) "Vague," because although the IEP

notes that D.G.M. wanted to attend a four-year college and work professionally with sports, it does not specify what he wished to study or what kind of sports-related work interested him. (ECF No. 13-2 at 21.) "Inaccurate," because the IEP indicates that D.G.M. "will live with family" even though he wanted to live in a college dormitory, according to his mother. (ECF No. 13-2 at 21 (citing R-7 at 7; 2Tr. 53:22-24, 54:14-55:4).)

"[T]ransition services should be evaluated under the FAPE standard." *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 822 (E.D. Pa. 2011). The Third Circuit Court of Appeals "has not defined what amount of transition planning is required in an IEP to ensure FAPE." *Perkiomen Valley Sch. Dist. v. R.B.*, 533 F. Supp. 3d 233, 250 (E.D. Pa. 2021) (citations omitted). "While a school district must provide opportunities for a disabled student to build independent living skills and explore a post-secondary educational or vocational plan, courts in the Third Circuit have emphasized that these requirements are undemanding and are focused more on exposure to opportunities than a promise of a particular outcome." *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 574 (E.D. Pa. 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014)).

After measuring the proposed IEP against the IDEA's requirements, the Court finds that the IEP did not need to include such specific information as Plaintiffs submit — descriptions of the specific area of sports-related work that D.G.M. wished to study. The IDEA aims to create opportunities for children with disabilities, not to guarantee a specific result. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 192 (1982) (citation omitted); *see K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 822 (E.D. Pa. 2011) ("A district is not required to ensure a Student is successful in fulfilling all desired goals.").

The Court's finding squares with testimonial evidence that the ALJ credited.  On the opportunities that the Career Academics class would create, Dr. O'Halloran testified as follows:

> A lot of those skills that I mentioned to you, a lot of those skills are important to succeeding within a college environment. . . .  [O]ne of the major topics are employment soft skills, so how do you manage your time, how do you interact with other people, how do you problem solve, those are all important skills that may not be "academic skills or academic knowledge," but they're important skills that one needs to be able to function within a college environment such as time management, how you interact with classmates on different types of projects you're working on, and how do you interact with your professor when you need assistance.

[(1Tr. 86:16-87:3.)]

As Dr. O'Halloran's testimony does not conflict with nontestimonial extrinsic evidence, the ALJ was entitled to credit it.

The Court is also not convinced that the asserted discrepancies would have deprived D.G.M. of a FAPE.  Plaintiffs have not explained why their preferred version of goals concerning sports-management and dormitory living was necessary to ensure that D.G.M. would receive a FAPE.  By contrast, when asked about the *will live with family* note, Zawisha sensibly explained that "these things evolve," adding that "this was done in December and if that was where he was going to live, then that's what I wrote."  (1Tr. 55:7-14.)  Even if Zawisha's description was incorrect or outdated, that error alone would not warrant reversal of the ALJ's finding.  *See Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 128 (3d Cir. 2011) (ruling that imperfect information in an IEP did not deprive the student of any educational opportunity); *L.M., ex rel. M.M. v. Downingtown Area Sch. Dist.*, Civ. No. 12-5547, 2015 WL 1725091, at *12 (E.D. Pa. Apr. 15, 2015) (finding that minor errors in IEP goals were not fatal).

Therefore, the allegedly vague and inaccurate content in the proposed IEP does not justify reversing the ALJ's final decision.

Third, Plaintiffs assert that the proposed IEP included no goals related to the Post Graduate transition program, or information about the Career Academics class or SLE.  (ECF No. 13-2 at 21-22.)  Plaintiffs claim that these omissions made it impossible for D.G.M.'s parents to know anything about the program based on the IEP.  (ECF No. 13-2 at 22.)

This third objection, unlike the previous two, concerns a lack of content in the proposed IEP.  "[T]he lack of content in an IEP as it relates to the notice parents receive about their child's proposed education" — as opposed to "the content of the IEP as such" — "implicate[s] the IEP's procedural requirements for content."  *Montgomery Cnty. Intermediate Unit No. 23 v. A.F. by & through D.F.*, 506 F. Supp. 3d 293, 306 (E.D. Pa. 2020) (collecting authorities); *see Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 128 (3d Cir. 2011) (noting that an IEP's failure to "contain an adequate description of the transition services that [the student] would be offered to bridge the gap between high school and her post-school activities . . . constitutes a procedural violation"); *c.f. Coleman v. Pottstown Sch. Dist.*, 581 F. App'x 141, 148 n.13 (3d Cir. 2014) (treating a claim of "deficiencies in an IEP's goals" as a "substantive challenge" because it concerns the IEP's substance and "does not implicate the IDEA's procedural requirements" (quoting *D.S.*, 602 F.3d at 565)).

Critical here, purely procedural violations are not actionable under the IDEA.  *J.T. ex rel. A.T. v. Dumont Pub. Sch.*, 533 F. App'x 44, 49 (3d Cir. 2013).  To be actionable, a procedural IDEA violation must "result[] in a loss of educational opportunity for the student, seriously deprive[] parents of their participation rights, or cause[] a deprivation of educational benefits."  *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 138 (3d Cir. 2022) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010)).  In other words, the procedural violation must "cause[]

substantive harm to the child or his parents." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010).[16]

Plaintiffs' counsel raised this missing-content issue at the due process hearing.  During cross-examination, Zawisha testified that "the Career Academics Class was meant to follow the goals that were developed in the IEP so, of course, there were goals."  (1Tr. 50:2-4.)  She had also testified that "the Career Academics class was meant to follow goals that were developed in the IEP."  (1Tr. 48:23-49:2, 49:12-50:4.)  As for the SLE, however, Zawisha conceded that the proposed IEP included no goals, adding that a parent could find out the goals of that program "[t]hrough the explanation of what that program is and through the facets of what would be explored in that program that include communication, attention to detail, I mean, that would be implemented within that program."  (1Tr. 50:5-16.)  Plaintiffs' counsel elicited similar testimony from Dr. O'Halloran, who testified that he "d[id] not see goals for" the employment aspects of the Career Academics class in the proposed IEP.  (1Tr. 105:24-106:5.)

Despite Plaintiffs' repeatedly pressing this point, the ALJ's final decision does not fully address it.  The ALJ notes within his testimony summaries that "there is no description of much of the programming because you simply cannot include all of the information and explanation in the IEP," and that "the career academics class is clearly offered as programming."  (ALJ Op. 4.)  That note, which includes no testimony citation,[17] is the ALJ's only statement concerning the

---

[16]     Plaintiffs framed all of their challenges as substantive ones, and the ALJ analyzed them as such.  (*See* ALJ Op. 11 ("In the instant matter petitioners allege substantive violations of the IDEA.").)  The Court will nevertheless analyze Plaintiffs' third challenge as procedural, given the above-mentioned precedent instructing that a challenge based on an IEP's lack of content, as opposed to the IEP's written content, implicates procedural rights.

[17]     For his note that "the career academics class is clearly offered as programming," the ALJ cites the proposed IEP (ALJ Op. 4 (citing R-7 at 12)), though neither party has ever disputed that the District offered to place D.G.M. in the Career Academics class.

proposed IEP's omission of goals for the Post Graduate program.  From that one note, however, the Court cannot meaningfully review the ALJ's finding that the proposed IEP, despite including no goals for the Post Graduate program, would have provided D.G.M. with a FAPE.

Therefore, the Court remands this matter to the ALJ to address Plaintiffs' objection that the proposed IEP's omission of goals for the Post Graduate program violated Plaintiffs' substantive rights under the IDEA.

### 2.    Proposed IEP As Implemented

Plaintiffs next assert that the proposed IEP was inappropriate as implemented.  (ECF No. 13-2 at 23.)  Plaintiffs contend that the program was not challenging enough for D.G.M., whose functional skills tended to outperform his standardized test scores.  Plaintiffs' expert witness Tighe, who observed the Career Academic class that D.G.M. would have enrolled in, testified that D.G.M. functions at a much higher level than the students in the class.  (ECF No. 13-2 at 23 (citing 2Tr. 109:5-16).)  Tighe also testified that when she observed the class, the day's lesson entailed finding prices on a fast-food menu with materials that had no text.  (ECF No. 13-2 at 23 (citing 2Tr. 109:20-110:17).)  Tighe opined that the wide gap between D.G.M.'s and the other students' abilities would have hamstrung his development.

But the ALJ did not need to credit Tighe's opinion.  Indeed, reasons to question the credibility of Tighe's opinions exist.  As the District highlights, Tighe conceded that she did not "know enough about the students to inform an opinion as to whether the instruction for one or more of those kids should have been differentiated such that they were receiving a greater depth or breadth of instruction than any of their peers."  (ECF No. 19 at 5; 2Tr. 128:20-129:4.)  Nor did Tighe "observe any of the general education environments that D.G.M. would have been educated

in had he accepted the IEP that was offered."  (2Tr. 129:5-22.)  Plaintiffs have not cited any nontestimonial extrinsic evidence establishing that the ALJ needed to credit Tighe's opinion.

That said, the ALJ's ruling on this point needs further explanation so that the Court can review it.  The ALJ concluded, "**I FIND** as **FACT** the testimony of the District's witnesses were credible to the extent of implementing the proposed IEP and programming with the SLE."  (ALJ Op. 9.)  The ALJ's opinion refers to Zawisha's testimony that staff members would never discourage a student from any positive pursuit, that "[e]mployment goals evolve and change," and that "[a]ll services provided would allow [D.G.M.] to bridge the gap to adult goals."  (ALJ Op. 4.)  The ALJ also referenced Dr. O'Halloran's testimony that "[s]tudents after completing the classroom portion participate in real-world work experience at the four local businesses" and that the "class is tailored to the students' needs," concluding that "[i]t is not a one-size-fits all.  It's differentiated for each student."  (ALJ Op. 4-5.)

The AJL did not, however, describe specific testimony or other record evidence concerning the way in which the District would implement the IEP to meet D.G.M.'s needs.  Notably missing from the opinion is an explanation as to why the ALJ believed that the services provided by the District would allow D.G.M. to bridge the gap to adult goals and that the classroom portion would be tailored to meet D.G.M.'s needs.  (*See* ALJ Op. 9; *see also* ALJ Op. 13 (discussing findings as to the SLE but not the Career Academics class).)  That explanation is necessary for the Court to determine whether D.G.M. could pursue his evolving employment goals where the District partners with only four local businesses.  Without a clear understanding of the ALJ's basis for crediting certain testimony on these issues, the Court cannot meaningfully measure the credibility determinations against nontestimonial extrinsic evidence.  *See N. Arlington*, 2019 WL 1495692,

at *4 (reviewing court may disturb the ALJ's credibility determinations "only upon a finding that non-testimonial extrinsic evidence justifies a contrary conclusion").

Therefore, the Court will remand to allow the ALJ an opportunity to further explain his basis for crediting the District witnesses' testimony about the proposed IEP as implemented, including with respect to the Career Academics class.

3.      ALJ's Evidentiary Rulings

Plaintiffs argue that several of the ALJ's evidentiary rulings amount to reversible error.

First, Plaintiffs assert that the ALJ erroneously accepted as experts Zawisha and O'Halloran, the District's two witnesses.  (ECF No. 13-2 at 26-31.)

In OAL hearings, expert-opinion testimony is admissible if the judge finds that it is (1) "[b]ased on facts and data perceived by or made known to the witness at or before the hearing," and (2) [w]ithin the scope of the special knowledge, skill, experience or training possessed by the witness."  N.J. Admin. Code § 1:1-15.9(b).

At the hearing, Plaintiffs did not contest that either witness satisfied the second prong.  (*See* 1Tr. 30:16-18 ("I don't question that Ms. Zawisha has expertise."), 74:13-16 (making "the same objection" as to Dr. O'Halloran).)  Rather, Plaintiffs objected to both witnesses on only one ground: the witnesses had not evaluated or otherwise had direct experience with D.M.G. and thus could not apply their expertise to the case's facts.  (1Tr. 30:13-31:5 (Zawisha), 81:1-4 (O'Halloran).)

The ALJ rejected Plaintiffs' objections, and the Court does not find that the ALJ erred in doing so.  Both experts testified that their opinions are based on facts and data, if not perceived by them, made known to them before the hearing.  Zawisha, who was D.G.M.'s case manager since he began high school, testified that in her experience as an expert in the special-education field,

case managers rely on testing performed by their colleagues: "[W]e incorporate everything, testing is a facet of that student's profile, it's not the entire picture, but it's certainly an important facet and the evaluations typically include observational information as well as standardized testing." (1Tr. 31:17-32:1.)  She testified that she based her opinions on "goals and objectives . . . developed with teachers who are familiar with [D.G.M.]" and her own informal observations."  (1Tr. 38:24-39:7.)  And she testified that as a case manager, she relied on data from teachers, as well as her own observations of D.G.M. to ensure that no disconnect existed between the teachers' progress reporting and how D.G.M. was "actually doing."  (1Tr. 44:3-16.)  O'Halloran likewise testified that he had reviewed the proposed IEP previously and has knowledge of the Career Academics class and SLE.  (1Tr. 81:25-83:2, 83:24-84:5, 87:4-18, 92:14-19.)  The ALJ properly accepted Zawisha and O'Halloran as experts.

Second, Plaintiffs assert that the ALJ relied on Zawisha's and Dr. O'Halloran's testimony that was not credible.  (ECF No. 13-2 at 31-37.)  Plaintiffs ask the Court to measure Dr. O'Halloran's testimony against that of Tighe and find that Tighe's deserves more credit.  But that is not the type of nontestimonial extrinsic evidence necessary for the Court to disturb the ALJ's credibility determinations.  Without such evidence, the Court must reject Plaintiffs' request.

As to Zawisha, Plaintiffs argue that her testimony shows that "she fundamentally misunderstood D.G.M.'s right to a FAPE."  (ECF No. 13-2 at 32.)  Federal regulations provide that "[t]he obligation to make FAPE available to all children with disabilities does not apply with respect to . . . [c]hildren with disabilities who have graduated from high school *with a regular high school diploma.*"  34 C.F.R. § 300.102(a)(3)(i) (emphasis added); *see M.N. v. Sparta Twp. Bd. of Educ.*, Civ. No. 21-19977, 2022 WL 1093667 (D.N.J. Apr. 12, 2022) (discussing federal and state standards for obtaining high school diplomas).

Plaintiffs contend that D.G.M. received a diploma but not a "regular high school diploma" within the meaning of the applicable laws and regulations; therefore, D.G.M. was entitled to a FAPE until he reached 21 years old.  Plaintiffs assert that Zawisha did not understand that D.G.M. would not receive a "regular high school diploma," and that misunderstanding skewed her preparation of the proposed IEP and plagued her opinion that the proposed IEP provided D.G.M. with a FAPE.  (ECF No. 13-2 at 32.)

The Court agrees that Zawisha's understanding of D.G.M.'s diploma eligibility is murky.  (*See* 1Tr. 34:2-11 (Zawisha) (testifying that D.G.M. would have been eligible for a diploma at the end of the 2021 school year).)  The ALJ, however, found that the proposed IEP provided a FAPE, regardless of Zawisha's alleged misunderstanding.  Indeed, nothing in the ALJ's opinion suggests that Zawisha's testimony on this topic influenced his final decision; in fact, the ALJ did not mention diploma eligibility.  The Court therefore cannot find that Zawisha's testimony caused any error of the ALJ.

It also appears that Plaintiffs did not meaningfully raise this issue at the administrative level.  Plaintiffs' due process petition mentions D.G.M.'s exemption from demonstrating high school level proficiencies on Statewide Assessments, though it includes nothing about the District's alleged misunderstanding of D.G.M.'s diploma eligibility.  (R-1 ¶ 7.)  Plaintiffs did not mention the issue during their opening remarks in the due process hearing.  (*See generally* 1Tr. 11:1-15:1.)  And although the issue was discussed briefly during Zawisha's cross-examination (*see* 1Tr. 62:22-64:14), the parties have not submitted to this Court anything suggesting that Plaintiffs pursued this challenge at the administrative level.  In addition, Plaintiffs' Statement of Material Facts does not raise the issue.  (*See generally* PSF.)  It appears that in this Court, Plaintiffs raised

this issue only in their motion papers and response to the District's Statement of Facts.   (*See* PRDSF ¶ 3.)

Plaintiffs' failure to assert this objection at the administrative level may result in waiver of the objection.   *See G.S. v. Cranbury Twp. Bd. of Educ.*, Civ. No. 10-774, 2011 WL 1584321, at *10 (D.N.J. Apr. 26, 2011), *aff'd*, 450 F. App'x 197 (3d Cir. 2011) ("Pursuant to the IDEA, the failure to raise an issue at the administrative level will result in a waiver of the issue on appeal to a district court." (collecting cases).); *D.C. v. Mount Olive Twp. Bd. of Educ.*, Civ. No. 12-5592, 2014 WL 1293534, at *21 (D.N.J. Mar. 31, 2014) ("[S]everal of the plaintiffs' present arguments were not presented to the agency either in form or in spirit, and thus cannot fairly be deemed exhausted under the framework established by Congress.").   If, however, Plaintiffs did assert the objection, the ALJ should have addressed it in his final decision.

Therefore, on remand the ALJ should resolve whether Plaintiffs waived their objection and, if they did not, whether Plaintiffs' objection affects the final administrative decision.

Third, and finally, Plaintiffs assert that the ALJ failed to independently analyze the evidence and legal issues in the case, made numerous factual errors, and did not apply the correct legal standard to the ultimate issue of the appropriateness of the proposed IEP, and thus his decision was inconsistent with record evidence, including nontestimonial extrinsic evidence.   (ECF No. 13-2 at 37-43.)

Plaintiffs claim that the ALJ did not address the following primary issues about the IEP: (1) the IEP lacked goals related to the Career Academics class and SLE, (2) the academic goals in the IEP could not possibly have been designed for the proposed Post Graduate program, and (3) the Post Graduate program was not designed to meet D.G.M.'s unique needs related to his

postsecondary goals.   (ECF No. 13-2 at 39.)   But these challenges reflect Plaintiffs' mere disagreement with the weight that the ALJ gave certain facts.

Plaintiffs also argue that the ALJ's finding that "the SLE program could have been modified to suit the needs of [D.G.M.]" as support for dismissing the petition (ECF No. 11-6 at 35) does not square with the rule that "in determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined." *Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.*, 560 A.2d 1180, 1189 (N.J. 1989).

Plaintiffs' point is unavailing.  The proposed IEP, which could be continuously modified or adjusted as needed (*see* 1Tr. 65:12-66:8 (Zawisha)), is different from the hypothetical IEP that gave the Court pause in *Lascari*.  And still, that an ALJ recognizes that "IEPs may be changed in the future depending on [the student's] evolving needs does not mean that the ALJ failed to determine whether [an] IEP at that time provided [the student] with a FAPE." *K.G. v. Cinnaminson Twp. Bd. of Educ.*, Civ. No. 17-04740, 2018 WL 4489672, at *7 (D.N.J. Sept. 19, 2018).

Plaintiffs also argue that the ALJ made several fact-finding and analytical errors.

First, Plaintiffs highlight that the ALJ's opinion discusses Plaintiffs' entitlement to compensatory education even though Plaintiffs never sought that relief.  (ECF No. 13-2 at 37-38.) Plaintiffs also say that the ALJ's Legal Analysis section "was lifted almost verbatim from" the case *D.P. & C.P. on Behalf of O.P., Petitioner*, OAL Dkt. No. EDS 03651-19, 2022 WL 1441025, at *13 (EFPS Jan. 10, 2022), which involved different issues from those in this case.  The ALJ also found that "the IEP goals and objectives were clearly met" (ALJ Op. 3 (citing R-7)), yet the IEP was never implemented and therefore could not have been met (ECF No. 13-2 at 40).  The ALJ further found that the proposed IEP "was appropriate because it would allow him to be in a

field of his choosing" (ALJ Op. 3), yet the SLE offered placements only at a hardware store, Walgreens, a public library, and Shop Rite (ECF No. 13-2 at 42).  Though the Court agrees that several of the ALJ's remarks are ambiguous, the remarks are not of a nature that justifies reversing the ALJ's conclusion.

Second, Plaintiffs attack the ALJ's determination that Tighe's opinions about the Career Academics class deserve less credit because D.G.M. was not in the class that she observed.  (ECF No. 13-2 at 41.)  But, once again, Plaintiffs' mere disagreement with the ALJ's credibility determination is not enough for this Court to disturb the determination.

Third, and finally, the ALJ found that D.G.M. "lacks the ability to comprehend critical thinking information in reading comprehension or language" (ECF No. 11-6 at 25), yet a Child Study Team examiner concluded that "it is difficult to describe [D.G.M.]'s overall intellectual functioning with a single score on the WAIS-IV as his verbal reasoning abilities are significantly more developed than his nonverbal reasoning abilities" (P-1 at 5 (5 Nov. 2019 CST psychological evaluation); ECF No. 13-2 at 40).  But ultimately, the examiner opined that "the test results represent a valid estimate of [D.G.M.]'s current cognitive functioning."  (P-1 at 5.)  Given that opinion, the Court cannot conclude that the ALJ's finding was not prima facie correct.

### B.     Appropriateness of TCNJ'S CCS Program

"Parents may unilaterally place their child at a different school, but are eligible for reimbursement from the school district if, and only if, the school district has not offered the student a FAPE." *J. F. v. Byram Twp. Bd. of Educ.*, 812 F. App'x 79, 81 (3d Cir. 2020) (citing *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)); N.J. Admin. Code § 6A:14-2.10(d).  Thus, when parents seek reimbursement for a unilateral placement, the first inquiry is whether the school district offered a FAPE.  *Shore Reg'l*, 381 F.3d at 198-99.  The school district

must show that "it complied with the procedures set out in the IDEA and that the IEP was 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential.'"  *Id.* at 199 (citing *Rowley*, 458 U.S. at 206-07).  If the school district offered a FAPE, then "no reimbursement is required."  *Id.* at 198 (citing N.J. Admin. Code 6A14-2.10(a)).

No one disputes the appropriateness of the CCS program.  (*See* ECF No. 19 at 6-7 ("The unilateral program in which the Plaintiffs have placed D.G.M. may be optimal."); *see also* ALJ Op. 9 ("I am also aware that the parents want the best educational opportunity for [D.G.M.], and they are providing it for him at the [CCS] Program at [TCNJ].").)  But because the Court cannot meaningfully review the ALJ's decision that the proposed IEP would have provided D.G.M. with a FAPE, it must wait to consider whether Plaintiffs deserve reimbursement for the CCS program.

### C.    Counts II & III: ADA & Section 504 Violations

For cases considering the education of children with disabilities, the same standards apply to ADA and Section 504 claims.  *Chisolm v. McManimon*, 275 F.3d 315, 325 n.9 (3d Cir. 2001); *see Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) ("[T]he same standards govern both [Section 504] and ADA claims.").

To prevail under the ADA and Section 504, a plaintiff must demonstrate that the child "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (citation omitted).  "[A] plaintiff cannot succeed on a discrimination claim simply by proving (1) that [he] was denied some service and (2) [he] is disabled.  [Instead, t]he [school] must have failed to provide the service for the sole reason that the child is disabled." *H.R. v. W. Windsor-*

*Plainsboro Bd. of Educ.*, Civ. No. 22-3103, 2023 WL 4744284, at *12 (D.N.J. July 25, 2023) (citations and quotation marks omitted).

Plaintiffs base their ADA and Section 504 claims on the same grounds as their IDEA claim: that the District failed to offer an IEP that would provide D.G.M. with a FAPE. Just as the Court cannot meaningfully review the ALJ's decision as to Plaintiffs' IDEA claim, it cannot address these claims.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, and other good cause shown, Plaintiffs' motion for summary judgment (ECF No. 13) is **DENIED**, and the District's motion for summary judgment (ECF No. 11) is **GRANTED in part** and **DENIED in part**, and this matter is **REMANDED** to the Administrative Law Judge. An appropriate Order follows.

Dated: March 5, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE