<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| D.M., *et al.*,<br><br>    Plaintiffs,<br><br> v.<br><br>WATCHUNG HILLS REGIONAL HIGH<br>SCHOOL BOARD OF EDUCATION,<br><br>    Defendant. | Civil Action No. 22-07500 (GC) (RLS)<br><br>    <u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

This matter comes before the Court upon competing renewed Motions for Summary Judgment filed by Defendant Watchung Hills Regional High School Board of Education (the District) and Plaintiffs D.M. and H.M., individually and on behalf of D.G.M.  (ECF Nos. 39, 40.)  Both sides opposed, and both sides replied.  (ECF Nos. 39, 40, 41, 43.)  The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Plaintiffs' Motion is **DENIED**, and the District's Motion is **GRANTED**.

**I.**  **BACKGROUND**

  **A.**  **Individuals with Disabilities Education Act (IDEA)**

Through the IDEA, the federal government provides funding to assist states with educating disabled children living within their borders.  *See* 20 U.S.C. §§ 1400, *et seq*.; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014).  To receive these funds, states must adopt policies and procedures meant to ensure that all children with disabilities receive a free

appropriate public education (FAPE).  20 U.S.C. §§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at

267-68.  In providing a FAPE, a state must provide an individualized education program (IEP) that

is "reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances." *J.M. v. Summit City Bd. of Educ.*, Civ. No. 19-00159, 2020 WL 6281719, at *1

(D.N.J. Oct. 27, 2020), *aff'd*, 39 F.4th 126 (3d Cir. 2022) (quoting *Endrew F. ex rel. Joseph F. v.

Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017)).  "If parents are dissatisfied with the

district's determinations or IEP, they may bring a challenge in a state administrative process and

then seek review in court." *Id.*

### B.    Factual Background

The Court has already ruled on the parties' previous motions for summary judgment and

remanded to the Administrative Law Judge (ALJ) to clarify three points.  (*See* ECF No. 22.)  The

ALJ issued a new opinion addressing those points, (ECF No. 24-1), and Plaintiffs have again

appealed the ALJ's decision, (ECF No. 39).  Because the parties are familiar with the underlying

facts—which have not changed since the Court issued its previous Opinion—and because the

parties continue to rely on the same administrative record that the Court had before it in its initial

Opinion, (ECF No. 39-1 at 1; ECF No. 39-2 at 5; ECF No. 40-1 at 6-7),[1] the Court will only

recount the facts necessary to resolve the instant Motions and will cite to its previous Opinion

when recounting those facts.  To the extent facts are relevant to the instant Motions that were not

addressed in the Court's previous Opinion, the Court will provide citations to the record.

This matter concerns the District's proposed IEP for D.G.M.'s placement for the 2021-

2022 school year.  (ECF No. 22 at 2.)

---

[1]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

At the time Plaintiffs filed the Due Process Petition, D.G.M. was a student classified as eligible for special education and related services under the category "Mild Intellectual Disability," residing within the Watchung Hills Regional School District. (*Id.*)  Since his freshman year of high school in the 2017-2018 school year, D.G.M. had an IEP placing him in "Special Classes"[2] for core academic subjects. (*Id.*)  His Full I.Q. score placed him at the first percentile level compared to his same-age peers, and his Verbal Comprehension score placed him at the fourth percentile. (*Id.*)

On December 8, 2020, when D.G.M. was a senior, the District convened an IEP team meeting,[3] which was attended by D.G.M.'s parents, to (1) revise D.G.M.'s IEP for the duration of his senior year and (2) develop his IEP for his post-senior year, the 2021-2022 school year. (*Id.* at 3.)  At that meeting, the team discussed D.G.M.'s program for that post-senior year. (*Id.*)

After that December 8, 2020 meeting, the District prepared an IEP describing D.G.M.'s placement for the rest of the 2020-2021 school year and the start of the 2021-2022 school year. (*Id.* at 4.)  The proposed IEP would maintain D.G.M.'s IEP without change for the rest of the 2020-2021 school year. (*Id.*)  For his post-senior year, *i.e.*, the 2021-2022 school year beginning in September 2021, the District proposed placing D.G.M. in its "Post Graduate" program, which consisted of the Career Academics Class (CAC) and Structured Learning Experience (SLE). (*Id.*) The CAC would meet for three 56-minute sessions during every four-day cycle, and the SLE would meet for twelve 56-minute sessions during every four-day cycle. (ECF No. 11-6 at 80-81; ECF

---

[2]    A "special class" serves "students who have similar intensive educational, behavioral, and other needs related to their disabilities in accordance with their IEPs." N.J.A.C. § 6A:14-4.7(a).

[3]    The IEP team includes "the parents of a child with a disability."  20 U.S.C. § 1414(d)(1)(B)(i).

3

No. 22 at 4.)  The CAC "would be a continuation of enhancing [D.G.M.]'s skill sets in Math and Reading Comprehension." (ECF No. 11-6 at 76.)  But it would also introduce him to skills related to "exploring employment, ways to enter into employment, hold employment and then transitioning out." (*Id.* at 125.)  The SLE would involve completing administrative tasks in the school like laminating papers, shredding documents, or delivering mail, (*id.* at 129), and it would involve "students go[ing] into the community and . . . work[ing] with employers" outside of school, (*id.* at 76).  For example, a student in the SLE may stock shelves at Walgreens or at the Warren Township Hardware Store.  (*Id.* at 130.)  If those tasks are too simple for the student, then the student can be tasked with more complex jobs such as sorting library books by genre or performing data entry work.  (*Id.* at 132.)  The student's interests are considered when pairing the student with an employer.  (*Id.* at 78.)  The proposed IEP included essentially the same goals as those in the prior year's IEP, and it added no goals for the Post Graduate program.  (ECF No. 22 at 4.)

On December 14, 2020, shortly after the IEP team meeting, D.G.M. applied to The College of New Jersey (TCNJ)'s Career and Community Studies (CCS) program for the 2021-2022 school year.  (*Id.*)  On March 16, 2021, D.G.M. was accepted into the program.  (*Id.*)

By letter dated March 18, 2021, Plaintiffs advised the District that D.G.M. had applied to and was accepted into the CCS program and asked the District to place D.G.M. in the CSS program for the 2021-2022 school year or otherwise pay for his tuition and related costs.  (*Id.*)  Plaintiffs warned that if the District refused, they would place him there themselves and seek reimbursement of his tuition and related costs from the District.  (*Id.*)  On March 31, 2021, the District responded that its proposed IEP program for D.G.M. was appropriate and that it would not pay for D.G.M. to attend the CCS program.  (*Id.*; ECF No. 14-6 at 75.)

### C.     Administrative Process

On September 29, 2021, Plaintiffs filed a Due Process Petition contending that the District

failed to offer D.G.M. an appropriate IEP through the December 8, 2020 IEP and therefore violated

D.G.M.'s right to a FAPE guaranteed under the IDEA, Americans with Disabilities Act (ADA),

Section 504 of the Rehabilitation Act of 1973, and unspecified New Jersey special education laws.

(ECF No. 22 at 5; ECF No. 11-6 at 13-21.)

In their petition, Plaintiffs sought the following relief:

- a declaration that . . . the District has violated D.G.M.'s right to a FAPE, which he is guaranteed under the IDEA, the ADA, Section 504 and New Jersey's special education laws, and that TCNJ's CCS program offers him a FAPE;

- an order directing the District to reimburse Petitioners for the costs of D.G.M.'s unilateral placement until the time of a final decision in this matter;

- an order directing the District to place D.G.M. at TCNJ's CCS program pursuant to an IEP;

- attorney's fees and costs; and

- such other relief as is just and appropriate.

(ECF No. 22 at 5; ECF No. 11-6 at 13-21.)

The ALJ held a two-day hearing on Plaintiffs' Petition.  (ECF No. 22 at 5.)  The ALJ ruled

in the District's favor after hearing testimony from four witnesses.  (*Id.*)  The District's witnesses

were: (1) Linda Zawisha, a learning disabilities teacher consultant who authored the challenged

IEP, served as D.G.M.'s case manager, and testified as an expert in special education and special

education programming; and (2) Dr. Patrick O'Halloran, the District's school psychologist who

testified as an expert in child psychology and special education.  (*Id.* at 5-11; ECF No. 11-6 at 24-

27, 118.)  Plaintiffs' witnesses were: (1) Dr. Jeanne Tighe, an expert in speech language pathology

who authored an evaluation finding D.G.M. was not offered a FAPE; and (2) Amy Schuler, the Assistant Director of TCNJ's CCS program. (ECF No. 22 at 11-12; ECF No. 11-6 at 27-29.)

The ALJ accepted "the information set out by the District as **FACT**," making the following specific findings:

- [T]he testimony of the District's witnesses [was] credible to the extent of implementing the proposed IEP and programming with the SLE.

- [T]he services provided by Watchung Hills clearly provide more than a "trivial" or "de minimis" educational benefit and [D.G.M.]'s education plan provides for "significant learning" and confers "meaningful benefit" to him.

- [T]he IEP provided by the District contained specific statements of the student's current performance levels, the student's short-term and long-term goals, the proposed educational services, and criteria for evaluating the student's progress.

- [T]he IEP contained both academic and functional goals related to the Core Curriculum Content Standards of the general education curriculum and "be measurable" so both parents and educational personnel were apprised of "the expected level of achievement attendant to each goal."

- [T]he District provided "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" and provided FAPE.

- [T]he District could modify the program to accommodate the needs and desires of [D.G.M.]

(ECF No. 22 at 13 (quoting ECF No. 11-6 at 31-32 (emphasis in original)).)

The ALJ concluded that the District proved that it "offered FAPE in the proposed IEP and programming," as "[t]he competent, credible, and relevant evidence . . . abundantly demonstrates that the proposed IEP and programming including the SLE addresses the many complexes of [D.G.M.]" (ECF No. 22 at 14 (quoting ECF No. 11-6 at 34-35).) The ALJ further concluded as follows:

> The IEP offered by the District here addressed [D.G.M.]'s individualized needs and created an appropriate system of goals and objectives to measure his progress in both short- and long-term

goals.  The IEP included specific, measurable goals pertaining to specific skills and reading and language programming.  The inclusion of generalized instructional techniques—such as added time as needed, eliminate visual distractors, and general in-class support—is alone not enough to carry the District's burden of proof that FAPE was offered.  *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 567 (3d Cir. 2010).  However, this is not a generic IEP and is specifically designed to meet [D.G.M.]'s individualized needs and confer upon him a meaningful educational benefit in the least restrictive environment.  This coupled with the fact that the SLE program could be specifically modified and differentiated for [D.G.M.] further supports my conclusion.  Although the SLE program at Watchung Hills may not be to the level or have the resources available as the CCS program at TCNJ, as admitted by H.M. during her testimony, the SLE program could have been modified to suit the needs of [D.G.M.]  Unfortunately, that's not acceptable by the petitioners.  Also, unfortunate is the fact that the District is not responsible to fund the unilateral placement.  **I CONCLUDE** that contrary to the petitioners, the District through its IEP and extensive programming provided FAPE to [D.G.M.]

(ECF No. 22 at 14 (quoting ECF No. 11-6 at 35 (emphasis in original)).)

Accordingly, the ALJ denied and dismissed Plaintiffs' Due Process Petition.  (ECF No. 22 at 14; ECF No. 11-6 at 36.)

### D.    District Court Proceedings

Following the ALJ's decision, Plaintiffs filed suit in this Court.[4]  (ECF No. 1.)  Plaintiffs asserted violations of (1) IDEA, 20 U.S.C. §§ 1400, *et seq.*; (2) Title II of the ADA, 42 U.S.C. § 12132; and (3) Section 504, 29 U.S.C. § 794.  The District answered.  (ECF No. 3.)  Because the parties did not intend to bring new evidence before the Court, the parties moved for summary judgment.  (ECF Nos. 11, 13.)

---

[4]    This Court has subject-matter jurisdiction under 20 U.S.C. § 1415(i)(3)(A) and 28 U.S.C. §§ 1331 and 1343.  *See K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 253 (3d Cir. 2018); *E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68, 71 (3d Cir. 2018).

On March 5, 2025, the Court issued an Opinion denying Plaintiffs' motion and granting in part and denying in part the District's motion.  (*See* ECF No. 22.)  The Court rejected the majority of Plaintiffs' challenges to the December 2020 IEP but remanded to the ALJ on three issues.  First, the Court could not "meaningfully review the ALJ's finding that the proposed IEP, despite including no goals for the Post Graduate program, would have provided D.G.M. with a FAPE," so it remanded "to the ALJ to address Plaintiffs' objection that the proposed IEP's omission of goals for the Post Graduate program violated Plaintiffs' substantive rights under the IDEA." (*Id.* at 25.)  Second, the Court remanded "to allow the ALJ an opportunity to further explain his basis for crediting the District witnesses' testimony about the proposed IEP as implemented" because the ALJ failed to supply an explanation in his original opinion.  (*Id.* at 27.)  Third, the Court remanded to the ALJ to evaluate whether Plaintiffs waived the objection that Zawisha mistakenly believed D.G.M. was not entitled to a FAPE during the Post Graduate program, and if not waived, whether "Plaintiffs' objection affects the final administrative decision."  (*Id.* at 29-30.)  In other words, it may have been the case that Zawisha crafted an IEP that did not provide D.G.M. with a FAPE given her potential misunderstanding of D.G.M.'s entitlement to the same, so the Court remanded to the ALJ to respond to that possibility.

### E.      Post-Remand Proceedings

On October 15, 2024, the ALJ issued a subsequent opinion addressing each of the three issues.  First, with respect to the lack of goals for the Post Graduate program, the ALJ noted that the IEP should have contained post-secondary goals, but this procedural violation did not amount to a violation of Plaintiffs' substantive rights. (ECF No. 24-1 at 2-5.)  Second, the ALJ explained why he credited the District witness's testimony with specific references to that testimony.  (*Id.* at 6-9.)  Third, the ALJ found that even if Plaintiffs did not waive the argument that Zawisha

8

misunderstood whether D.G.M. was entitled to a FAPE during the Post Graduate program, such a misunderstanding did not change the ALJ's finding that D.G.M. was offered a FAPE.  (*Id.* at 9.)

Following the ALJ's second opinion finding in favor of the District, Plaintiffs moved for summary judgment, and the District cross-moved.  (ECF Nos. 39, 40.)   These Motions for Summary Judgment are currently before the Court.

## II.     <u>LEGAL STANDARD</u>

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record."  *K.H. ex rel. B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, Civ. No. 05-4925, 2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006) (citing *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003)).  "The standard of review under which this Court considers an appeal of a state administrative decision under the IDEA differs from that governing the typical review of summary judgment."  *M.A.*, 202 F. Supp. 2d at 359 (citation and internal quotation marks omitted).  The parties' motions, though framed as ones for summary judgment, are truly appeals of the ALJ's ruling.  *G.S. v. Cranbury Twp. Bd. of Educ.*, Civ. No. 10-774, 2011 WL 1584321, at *8 (D.N.J. Apr. 26, 2011), *aff'd*, 450 F. App'x 197 (3d Cir. 2011); *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007), *aff'd*, 263 F. App'x 264 (3d Cir. 2008).

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ."  *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).  "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citation and internal quotation marks omitted).  "Moreover, the reviewing court must accept

the ALJ's credibility determinations and 'may disturb them only upon a finding that non–testimonial extrinsic evidence justifies a contrary conclusion.'" *E.P. v. N. Arlington Bd. of Educ.*, Civ. No. 17-08195, 2019 WL 1495692, at *4 (D.N.J. Apr. 1, 2019) (quoting *C.S. v. Montclair Bd. of Educ.*, Civ. No. 16-3294, 2017 WL 4122433, at *4 (D.N.J. Sept. 18, 2017)).  An ALJ's legal determinations, on the other hand, are reviewed de novo. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011).  "Applying these standards, the district court may make findings 'based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education.'" *Id.* (quoting *D.S.*, 602 F.3d at 564).

Relevant here, district courts cannot "substitute their own notions of sound educational policy for those of the school authorities." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982).  Indeed, "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id.* at 208 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)).  So when the administrative body does not adequately explain its findings, the district court may remand the matter for further development. *See, e.g.*, *Upper Freehold Reg'l Bd. of Educ. v. T.W.*, 496 F. App'x 238, 244-45 (3d Cir. 2012); *Livingston Bd. of Educ. v. D.A. on behalf of D.A.*, Civ. No. 17-8802, 2021 WL 3706723, at *5 (D.N.J. Aug. 20, 2021).

## III.   DISCUSSION

The Court remanded three issues to the ALJ, and the ALJ responded to each. The Court will analyze each issue in turn.

### A. Whether Failure to Include Goals for D.G.M.'s Post Graduate Program Violated Plaintiffs' Substantive Rights Under the IDEA

Under the IDEA, school districts must work with parents to design an IEP. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). An "IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)). "Although the IEP must provide the student with a 'basic floor of opportunity,'" to provide a student with a FAPE, the IEP "does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (quoting *D.S.*, 602 F.3d at 557). Rather, an IEP must, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Ridley,* 680 F.3d at 269 (internal citations and quotation marks omitted); *see also K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (noting the "longstanding formulation" described in *Ridley*); *E.P.*, 2019 WL 1495692, at *4 ("[T]he IDEA 'requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'") (quoting *Endrew F.,* 580 U.S. at 403 (2017)). "Thus, a school district need not 'maximize the potential of every handicapped child, [but] must supply an education that provides "significant learning" and "meaningful benefit" to the child.'" *Coleman v. Pottstown Sch. Dist.*, 581 F. App'x 141, 147 (3d Cir. 2014) (internal citations omitted). "[A] court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made." *D.S.*, 602

11

F.3d at 564-65. "The issue of whether an IEP is appropriate is a question of fact." *Id.* at 564 (internal quotation marks and citations omitted).

"[T]he lack of content in an IEP as it relates to the notice parents receive about their child's proposed education"—as opposed to "the content of the IEP as such"—"implicate[s] the IEP's procedural requirements for content." *Montgomery Cnty. Intermediate Unit No. 23 v. A.F. by & through D.F.*, 506 F. Supp. 3d 293, 306 (E.D. Pa. 2020) (collecting authorities); *see also Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 128 (3d Cir. 2011) (noting that an IEP's failure to "contain an adequate description of the transition services that [the student] would be offered to bridge the gap between high school and her post-school activities . . . constitutes a procedural violation"). Critical here, purely procedural violations are not actionable under the IDEA. *J.T. ex rel. A.T. v. Dumont Pub. Sch.*, 533 F. App'x 44, 49 (3d Cir. 2013). To be actionable, a procedural IDEA violation must "result[] in a loss of educational opportunity for the student, seriously deprive[] parents of their participation rights, or cause[] a deprivation of educational benefits." *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 138 (3d Cir. 2022) (quoting *D.S.*, 602 F.3d at 565). In other words, the procedural violation must "cause[] substantive harm to the child or his parents." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010).

Plaintiffs argue that the omission of goals in the IEP for the Post Graduate program violated both D.G.M.'s and his parents' rights under the IDEA. As for D.G.M., Plaintiffs contend that even though the ALJ reasoned that the IEP listed some goals, the fact that it did not list specifically Post Graduate goals renders it "impossible to know if the instruction and services in the CAC and SLE were going to be tailored to meet D.G.M.'s particular disability-related educational needs related to his postsecondary goals[.]" (ECF No. 39-2 at 16-17.) As for D.G.M.'s parents, Plaintiffs argue

12

that they were denied a meaningful opportunity to participate in the IEP process because they repeatedly expressed their concerns to the District to no avail.  (*Id.* at 19-33.)

The District responds that, with respect to D.G.M., the IEP would have been modified had Plaintiffs not "short-circuit[ed]" the process, and regardless, the IEP was sufficient to meet D.G.M.'s transition and Post Graduate needs.  (ECF No. 41 at 2-10.)  And as for D.G.M.'s parents, the District contends that "the record demonstrates that the parents had ample opportunity to advocate on behalf of D.G.M. and participate in the IEP process."  (ECF No. 40-1 at 17; ECF No. 41 at 3.)

### 1.    *D.G.M.'s Substantive Rights*

Plaintiffs have not met their burden to establish that the lack of Post Graduate goals in the challenged IEP "result[ed] in a loss of educational opportunity" or "cause[d] a deprivation of educational benefits" such that D.G.M. was denied a FAPE.  (ECF No. 22 at 23 (quoting *J.M.*, 39 F.4th at 138).)  Indeed, beyond outlining the applicable legal standards, Plaintiffs do not offer a single case citation finding a denial of a FAPE in similar circumstances.  (*See* ECF No. 39-2 at 14-19; ECF No. 43 at 10-14.)  Yet, it is the "party challenging an administrative decision" under the IDEA who "bears the burden of persuasion and 'faces the additional hurdle of overcoming a presumption that the hearing officer's findings were correct.'"  *S.D.*, 811 F. Supp. 2d at 1064 (quoting *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 345 (3d Cir. 2007)).

Here, on remand, the ALJ found that the lack of Post Graduate goals—even if a procedural violation—did not deny D.G.M. a FAPE for two reasons.  First, the ALJ reasoned that the December 2020 IEP was issued several months before the commencement of the CAC and SLE programs in September 2021, so the IEP could have been refined at the "annual review meeting" had the parents not rejected the IEP at a premature stage.  (ECF No. 24-1 at 3-5.)  Second, the ALJ

13

found the IEP offered a FAPE as written because credible testimony established that the CAC and SLE programs would provide educational benefits and, through those programs, D.G.M. would receive individualized instruction.  (*Id.*)

The District urges the Court to uphold these findings.  It relies on *P.C. ex rel. J.C. v. Harding Township Board of Education*, Civ. No. 11-06443, 2013 WL 3938969 (D.N.J. July 31, 2013), in support of the ALJ's first line of reasoning.  (ECF No. 40-1 at 11.)  In *P.C.*, the Child Study Team presented an IEP on August 21, 2009 for a student with autism who would be beginning in a new school district, but that IEP "did not contain a statement of goals and objectives."  2013 WL 3938969, at *3.  The Child Study Team did not include goals or objectives because it "did not have enough information about" the child and planned to "reconvene in 30 days in order to add goals and objectives to the 2009 IEP."  *Id.*  The ALJ found the 2009 IEP did not deny the child "the opportunity to receive a meaningful educational benefit" because the Child Study Team planned to "reconvene the IEP meeting with the advantage of meaningful testing input."  *Id.* at *6. Therefore, even though the IEP was not complete at the beginning of the school year, the school "demonstrated a good-faith effort to take such steps to professionally complete the IEP as soon into the beginning of the school year as possible."  *Id.*  The district court upheld the ALJ's finding. It reasoned that because the school was in the process of updating the IEP, and because the parents "short-circuited the process, the [c]ourt cannot say whether the finalized IEP would have resulted in a loss of educational opportunity or would have caused a deprivation of educational benefits." *Id.* at *9 (internal quotation marks and citation omitted).  Accordingly, the court found the plaintiffs did "not meet their burden to set forth an actionable violation of the IDEA."  *Id.*

The Third Circuit has held similarly.  In *C.H. v. Cape Henlopen School District*, a student's IEP was not finalized prior to the start of the 2006-2007 school year.  *See* 606 F.3d at 63.  However,

before the IEP was set to be finalized, the child's parents removed the child to private school and filed a Due Process Petition seeking tuition reimbursement. *Id.* at 63-64. The Third Circuit found the procedural violation was not actionable because the school "demonstrated consistent willingness to evaluate [the child] and to develop an IEP for the 2006-2007 school year" whereas it was the parents who "terminated the process by filing a due process request." *Id.* at 69. Additionally, the Third Circuit lacked "the ability to determine whether the failure to develop an IEP on the first day of classes would have resulted in a lost educational benefit for the disabled child" because the child "never attended a single class in the District in the 2006-2007 school year." *Id.*

Here, the Court is similarly unable to conclude that D.G.M. lost an educational opportunity or was deprived of an educational benefit such that he was denied a FAPE. There are numerous parallels between *P.C.*, *C.H.*, and this matter. First, like in *P.C.* and *C.H.*, the challenged IEP was procedurally defective; it did not contain goals specific to the CAC and SLE. (ECF No. 24-1 at 2-3.) Second, like in *P.C.* and *C.H.*, this is not a case about an IEP with goals that remained unchanged "in the face of . . . continuous frustration and lack of progress," (ECF No. 22 at 20 (quoting *Damarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 53 n.7 (D.D.C. 2016)), but instead concerns the difficult task of crafting an IEP for a student who is set to begin a new type of program. In *P.C.* and *C.H.*, the students were set to enter new schools, and here, D.G.M. would be entering a new type of school—even if within the same school system. *Cf. A.M. ex rel. A.J. v. Interobro Sch. Dist.*, Civ. No. 25-3083, 2026 WL 114260, at *3 (E.D. Pa. Jan. 14, 2026) ("Appropriateness [of the IEP] is judged prospectively, based on what the school district knew when the IEP was offered." (citing *D.S.*, 602 F.3d at 564-65)). Third, the parents in each of these three cases opted for a different schooling route before the IEP was finalized and implemented.

15

Given these considerations, the courts in *P.C.* and *C.H.* found no substantive IDEA violations when the IEPs were not yet complete by the time the relevant school year began.

In the instant matter, the IEP was issued almost ten months before the relevant school year. (*See* ECF No. 24-1 at 3). Thus, as the ALJ clarified on remand, there was ample time for the IEP to be revised and at "the annual review meeting the parents would obtain more detailed and specific information." (*Id.*) The ALJ made this factual finding based on Zawisha's testimony, in which she stated that (1) "we have separate descriptors [for the CAC] that are discussed during the Annual Review;" (2) "if . . . there's more information [about the SLE, then] that's discussed during the [Annual Review];" and (3) "an IEP can always be revised if need be." (ECF No. 11-6 at 88-90.) Because the Court must give "due weight to the factual findings of an ALJ," *L.E.*, 435 F.3d at 389, and presume those findings to be "prima facie correct," *D.S.*, 602 F.3d at 564, the Court will not disturb the ALJ's finding that at the "annual review meeting the parents would obtain more detailed and specific information" about the CAC and SLE programs in relation to individualized goals for D.G.M. (ECF No. 24-1 at 4.)[5] *See also Ridley*, 680 F.3d at 274-75 (finding procedural violation did not amount to substantive IDEA violation when IEP was later supplemented by other documents that "specif[ied] all of the special education services that [the child] would receive"). Therefore, in accordance with *P.C.* and *C.H.*, the Court will affirm the ALJ's determination that

---

5       The parties debate whether an annual review meeting would have taken place between the December 8, 2020 IEP and the commencement of the CAC and SLE programs. (*See* ECF No. 39-2 at 28-29; ECF No. 41 at 5.) Plaintiffs argue that "the December 8, 2020, IEP was in fact developed at an Annual Review IEP Team meeting" and therefore there would be no additional meeting. (ECF No. 39-2 at 28-29.) However, this argument is at odds with Zawisha's testimony that there would be a forthcoming meeting. (ECF No. 11-6 at 88-90.) With the entire record before him, the ALJ found that there would be an annual review meeting at which "the goals could have been discussed and refined." (ECF No. 24-1 at 5.) Because this Court must give "due weight" to the ALJ's factual findings, *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006), it rejects Plaintiffs' argument.

the omission of goals for the CAC and SLE programs did not violate D.G.M.'s substantive rights under the IDEA.

But even if the argument that the IEPs were subject to revision was insufficient, the Court will affirm the ALJ's decision on the independent basis that the Court cannot find that the IEP, as written, violated D.G.M.'s substantive rights. A school district is not "required to create distinct measurable goals for each recognized need of a disabled student to provide a FAPE." *Coleman*, 581 F. App'x at 147 (internal quotation marks omitted); *cf. High v. Exeter Twp. Sch. Dist.*, Civ. No. 09-2202, 2010 WL 363832, at *6 (D.N.J. Feb. 1, 2010) (noting the Third Circuit has affirmed that "a bare transition plan in a child's IEP did not deny the student FAPE" (citing *Sinan L. v. Sch. Dist. of Phila.*, Civ. No. 06-1342, 2007 WL 1933021, at *8 (E.D. Pa. July 2, 2007), *aff'd*, 293 F. App'x 912 (3d Cir. 2008))).

Here, Dr. O'Halloran, who had over twenty years of experience at the District and authored hundreds of IEPs, testified that the Post Graduate program "proposed for [D.G.M.] for the following school year would be appropriately designed to confer him with educational benefit." (ECF No. 11-6 at 118, 123-124.) He testified that the skills in the CAC program—such as time-management, problem-solving, and interacting with other people—are "skills . . . important to succeeding within a college environment," which was one of D.G.M.'s eventual goals. (*Id.* at 127-128.) And as for the SLE, Dr. O'Halloran stated that "in terms of college preparation, I think it's a nice situation where a student can learn job skills and become gainfully employed as they're going to school." (*Id.* at 132.) He clarified that even though there were no placements in sports management— D.G.M.'s desired field—"the skills that they're learning in the [SLE] program are skills that could be applied to [those] future jobs." (*Id.* at 152.) And when presented with the challenge that these two programs might be "below [D.G.M.'s] level," Dr. O'Halloran responded that the District "would be able to customize the instruction for him based on his needs and based on his skills[.]

17

[I]t's a small enough program with staff working with him that we could individualize it and work towards his level." (*Id.* at 156.) Dr. O'Halloran concluded that he had "no doubt" that the IEP was appropriate for D.G.M. (*Id.* at 113.)

On remand, the ALJ relied heavily on this testimony and concluded that the "lack of goals specific to the Post Graduate program in the December 2020 IEP did not violate petitioners' substantive rights under the IDEA." (ECF No. 24-1 at 5-6.) Because the District was not "required to create distinct measurable goals for each recognized need of [D.G.M.]," *Coleman*, 581 F. App'x at 147, such that even a "bare transition plan" could be sufficient," *High*, 2010 WL 363823, at *6, the Court is satisfied with the ALJ's explanation that the IEP as written—which included programs that would help D.G.M. achieve his goals—did not deny D.G.M. substantive rights under the IDEA.

### 2.    *D.M.'s and H.M.'s Substantive Rights*

Plaintiffs argue that not only were D.G.M.'s rights violated by the omissions, but so too were his parents' rights. (ECF No. 39-2 at 19-33.) The District responds that "the record demonstrates that the parents had ample opportunity to advocate on behalf of D.G.M. and participate in the IEP process." (ECF No. 40-1 at 17; ECF No. 41 at 3.) The Court agrees with the District.

Procedural violations of IDEA that "seriously deprive parents of their participation rights are actionable." *C.M. v. Bd. of Educ. of Union Cnty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 881 (3d Cir. 2005). The Third Circuit has found these rights were not deprived when parents "were presented with a draft IEP," "made several suggestions," and some of those suggestions were incorporated. *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir. 1993); *see also D.S.*, 602 F.3d at 555 (similar). Indeed, even when the parents' position is rejected, that does not mean the parents were deprived of their participation rights. *See L.G. v. Fair Lawn Bd. of Educ.,*

18

Civ. No. 09-6456, 2011 WL 2559547, at *4 (D.N.J. June 27, 2011) (affirming ALJ's decision when there was "meaningful, albeit unsuccessful, parental involvement"), *aff'd*, 486 F. App'x 967 (3d Cir. 2012). The court in *L.G.* explained that the "fact that the child study team ultimately disagreed with [the] parents does not mean that the parents were denied meaningful participation. If the standard for measuring meaningful parental participation was that the parents always prevailed, there would be no process at all." *Id.* at *5; *see also Ridley,* 680 F.3d at 275 (finding parents were not denied participation rights when they "were intimately involved in the process of crafting [their child's] IEP and do not contend that they were unaware of the services [their child] was scheduled to receive").

Here, the Court finds D.G.M.'s parents were not seriously deprived of their participation rights. H.M. testified that she and her husband attended "all of th[e]" IEP meetings. (ECF No. 11-6 at 206.) And when H.M. felt the IEPs were moving in a direction that focused too heavily on basic job training, H.M. raised those concerns with Zawisha and informed her about the CCS program in hopes that the District could replicate it. (ECF No. 11-6 at 209-212.) At the December 8, 2020 meeting, which both parents attended, H.M. raised similar concerns and was told that the program would be modified as needed. (ECF No. 11-6 at 206, 214.) In the months after, according to H.M., Zawisha "made no changes" and "the relationship deteriorated." (ECF No. 11-6 at 219.) Based on these facts, H.M. and D.M. had "meaningful, albeit unsuccessful, parental involvement." *L.G.,* 2011 WL 2559547, at *4. But this is insufficient to constitute a "serious depriv[ation] of their participation rights." *C.M.*, 128 F. App'x. at 881; *see also Ridley,* 680 F.3d at 275*; L.G.,* 2011 WL 2559547, at *5; *Fuhrmann*, 993 F.2d at 1036; *D.S.*, 602 F.3d at 555.

19

**B.    Whether the ALJ Properly Credited the District's Witnesses' Testimony Concerning the IEP as Implemented**

In its previous Opinion, the Court remanded to the ALJ on a narrow ground regarding the credibility of the District's witnesses.  In his original opinion, the ALJ found that "the testimony of the District's witnesses were credible to the extent of implementing the proposed IEP[.]"  (ECF No. 11-6 at 31.)  However, the Court found that the ALJ, in making this factual determination, "did not. . . describe specific testimony or other record evidence concerning the way in which the District would implement the IEP to meet D.G.M.'s needs."  (ECF No. 22 at 26.)  So it remanded for the ALJ to explain, based on testimony or other record evidence, "why the ALJ believed that the services provided by the District would allow D.G.M. to bridge the gap to adult goals" and why the programs "would be tailored to meet D.G.M.'s needs."  (*Id.*)  Thus, the Court remanded "to allow the ALJ an opportunity to further explain his basis for crediting the District witnesses' testimony about the proposed IEP as implemented[.]"  (*Id.* at 27.)

On remand, the ALJ explained the basis for his finding.  With respect to "adult goals,"—attending a four-year college and working in sports management (*see, e.g.*, *id.* at 132, 152)—the ALJ relied on the District witnesses' testimony.  (ECF No. 24-1 at 7-9.)  As the ALJ recounted, Dr. O'Halloran testified that the CAC "would benefit a student who plans on attending college."  (*Id.* at 8 (citing ECF No. 11-6 at 127 (Dr. O'Halloran testifying that "one of the major topics [in the CAC] are employment soft skills, so how do you manage your time, how do you interact with other people, how do you problem solve, those are all important skills that may not be 'academic skills or academic knowledge,' but they're important skills that one needs to be able to function within a college environment")).)  And Dr. O'Halloran testified that the SLE is a program "where a student can learn job skills and become gainfully employed as they're going to school" which would help the student "in terms of college preparation."  (ECF No. 11-6 at 132.)  Dr. O'Halloran

20

also testified that "the skills that they're learning in the [SLE] program are skills that could be applied to future jobs" in sports management. (*Id.* at 152.)

With respect to meeting D.G.M.'s tailored needs, as the ALJ noted, both Zawisha and Dr. O'Halloran testified that the CAC and SLE programs would be modified and individualized. (ECF No. 24-1 at 7-9 (citing ECF No. 11-6 at 88 (Zawisha testifying that "separate descriptors . . . are discussed during the Annual Review" for the CAC); *id.* at 89 (Zawisha testifying that "there's more information that's discussed [about the SLE] during the [Annual Review] meeting); *id.* at 78 (Zawisha testifying that a student's "interests are always taken into account" when making SLE placements); *id.* at 125 (Dr. O'Halloran testifying that the CAC instructor works with the student based on "the interests and preferences that the individual expresses"); *id.* at 130, 132 (Dr. O'Halloran testifying that SLE instructor "speak[s] with the students to ask them what their preferences are," and if a task was too easy for D.G.M., the school would "probably transition him on to some of the other positions" commensurate with his "higher functioning skills")).)

Plaintiffs argue the ALJ's explanation was insufficient because, "[e]ven if the facts asserted in the testimony relied upon were correct, the testimony of District witnesses did not provide any concrete or specific information regarding how the instruction and services in the CAC and SLE were going to be tailored to meet D.G.M.'s disability-related needs related to his postsecondary goals[.]" (ECF No. 39-2 at 36.) The District argues the ALJ's findings were sufficient and that credibility determinations are entitled to deference. (ECF No. 40-1 at 21).

"This Court must accept the ALJ's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *L.M. v. Willingboro Twp. Sch. Dist.*, Civ. No. 16-3672, 2017 WL 2539388, at *5 (D.N.J. June 12, 2017) (citations omitted). "[I]n this context, the word 'justify' requires that the applicable standard of review be essentially

the same as that a federal appellate court applies when reviewing a trial court's findings of fact." *D.S.*, 602 F.3d at 564 (citing *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)). "Federal appellate courts review district courts' factual findings for clear error." *L.M.*, 2017 WL 2539388, at *5 (citing *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 283 (3d Cir. 2014)).

Here, the Court finds that the ALJ's explanation on remand was sufficient. The ALJ credited testimony by Zawisha and Dr. O'Halloran indicating that (1) the SLE and CAC programs would help D.G.M. achieve his goals of attending a four-year college and working in sports management and (2) those programs would also be modified to fit D.G.M.'s particular needs and abilities. (*See* ECF No. 24-1 at 7-9 (citing ECF No. 11-6 at 78, 88-89, 125, 130, 132, 152).) Accordingly, because the Court has now been presented with the evidence on which the ALJ relied and has not been presented with non-testimonial extrinsic evidence to the contrary, *see L.M.*, 2017 WL 2539388, at *5, it will defer to the ALJ's finding that "the testimony of the District's witnesses were credible to the extent of implementing the proposed IEP," (ECF No. 22 at 26 (citing ECF No. 11-6 at 31).) *See also Rowley*, 458 U.S. at 206 ("[District courts cannot] substitute their own notions of sound educational policy for those of the school authorities.")

### C.    Whether Plaintiffs Waived Their Challenge to Zawisha's Understanding of D.G.M.'s Entitlement to a FAPE and Whether This Challenge Changes the Outcome

The Court remanded on a third and final ground. In their first motion for summary judgment, Plaintiffs argued that Zawisha "fundamentally misunderstood D.G.M.'s right to a FAPE." (ECF No. 13-2 at 32.) Federal regulations outline that a student who has received "a regular high school diploma" is no longer entitled to a FAPE. 34 C.F.R. § 300.102(a)(3)(i). Plaintiffs argued D.G.M. would not receive such a diploma after the 2020-2021 school year because he failed to satisfy certain standardized testing requirements, so he was entitled to a FAPE

22

during his 2021-2022 Post Graduate year at the District.  (ECF No. 13-2 at 32; *see also* ECF No. 11-6 at 104-105.)  When Zawisha was asked whether D.G.M. "would have been eligible for a diploma at the end of the 2021 school year but for your recommendation that he continue receiving services from [the District]," Zawisha replied: "Yes.  Sometimes there's a fine line and with [D.G.M.], he could have benefited from the [Post Graduate] program."  (ECF No. 11-6 at 75.)  Plaintiffs argue this testimony means that Zawisha misunderstood that D.G.M. would be entitled to a FAPE during the 2021-2022 Post Graduate year, and Plaintiffs contend that Zawisha only included the Post Graduate program in D.G.M.'s IEP because it could have benefited him, not because the District was required to provide him with a FAPE.  (ECF No. 13-2 at 32.)

In its previous Opinion, the Court agreed with Plaintiffs that "Zawisha's understanding of D.G.M.'s diploma eligibility is murky."  (ECF No. 22 at 29.)  But the Court noted that Plaintiffs may have waived this argument because they did not raise it in their Due Process Petition and that the only instance when it came up was briefly during cross-examination.  (ECF No. 22 at 29 (citing ECF No. 11-6 at 103-105).)[6]  Accordingly, the Court remanded to the ALJ to "resolve whether Plaintiffs waived their objection, and if they did not, whether Plaintiffs' objection affects the final administrative decision."  (ECF No. 22 at 30.)

On remand, the ALJ did not squarely address the waiver issue but found that, in any event, the objection did not alter the ALJ's decision.  (ECF No. 24-1 at 9.)  The ALJ explained that "Zawisha's purported confusion over the FAPE entitlement of a non-graduated post-twelfth-grade student did not affect her credibility nor [the ALJ's] acceptance of [Zawisha's testimony.]"  (*Id.*)  The ALJ also stated that the "combination of O'Halloran's testimony and the documentary

---

[6]    Plaintiffs appear to have also raised the objection in their post-hearing brief at the administrative level.  (*See* ECF No. 24-1 at 9; ECF No 39-2 at 43.)

evidence, was proper and founded in the facts presented to me and the relevant law, for [the ALJ] to conclude that the challenged December 2020 IEP offered FAPE in the [least restrictive environment.]"  (*Id.*)

Plaintiffs repeat their arguments from their first summary judgment motion.  They contend that Zawisha did not think D.G.M. was entitled to a FAPE and therefore did not author an IEP that provided him with one.  (ECF No. 39-2 at 43.)  Plaintiffs submit that Zawisha's position is "in line with the District's position that D.G.M. was 'diploma eligible' in the spring of 2021, and that they gratuitously offered him an IEP with transition services merely because he could benefit from it" rather than because he was entitled to receive a FAPE under the IDEA.  (*Id.*)  The District argues that even if Zawisha did have a misunderstanding, it did not change whether the December 2020 IEP provided D.G.M. with a FAPE.  (ECF No. 40-1 at 23; ECF No. 41 at 10.)

The Court agrees with the District.  First, Zawisha nowhere states that she believed D.G.M. was not entitled to a FAPE if he continued at the District for the 2021-2022 school year.  On direct examination, Zawisha responded affirmatively when asked whether D.G.M. "would [] have been eligible for a diploma . . . but for your recommendation that he continue receiving services from [the District]."  (ECF No. 11-6 at 75.)  In other words, Zawisha nowhere states that D.G.M. was not entitled to a FAPE but instead affirms that she pursued her recommendation for D.G.M. to continue receiving services during the 2021-2022 Post Graduate year.  Second, even if Plaintiffs' interpretation of the exchange were correct, Zawisha and the District both testified that they believed D.G.M. did in fact receive a FAPE.  (*See* ECF No. 11-6 at 80 (Zawisha responding affirmatively to question of whether "the IEP that you offered to [D.G.M.] would have provided a free appropriate public education in the least restrictive environment"); *id.* at 49 ("[The District] believe[s] that the IEP we had proposed offers FAPE.").)  Third, the ultimate question is not

24

whether certain witnesses believed that D.G.M. was entitled to a FAPE; instead, the key inquiry is whether, through the December 2020 IEP, D.G.M. would have received a FAPE. *See P.C.*, 2013 WL 3938969, at *9 (affirming decision when the "ALJ determined that the IEP would have provided [the child] with FAPE"). Here, the ALJ found D.G.M. would have received a FAPE, and as the Court explained, *see supra* Section III.A, the Court will accept the ALJ's finding. Accordingly, the Court affirms the ALJ on this final point.[7]

## IV.    CONCLUSION

For the foregoing reasons, and other good cause shown, Plaintiffs' Motion for Summary Judgment (ECF No. 39) is **DENIED**, and the District's Motion for Summary Judgment (ECF No. 40) is **GRANTED**. An appropriate Order follows.

Dated: March 24, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[7]    Plaintiffs base their ADA and Section 504 claims on the same grounds as their IDEA claim: that the District failed to offer an IEP that would provide D.G.M. with a FAPE. (ECF No. 22 at 34.) Because the Court affirms the ALJ's decision that the IDEA claim fails, so too do Plaintiffs' ADA and Section 504 claims. *See R.G. ex rel. Maria G. v. Downingtown Area Sch. Dist.*, 528 F. App'x 153, 156 (3d Cir. 2013).